1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ROSEMARY D. MARTINEZ,                    CASE NO. CV-F-04-6133 LJO

12               Plaintiff,                   **MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S APPEAL FROM ADMINISTRATIVE DECISION** (Doc.13 )

13         vs.

14   _____

15   JO ANNE BARNART,
     Commissioner of Social Security,

16
                 Defendant.
17   _____/

18         Plaintiff Rosemary D. Martinez ("claimant") seeks judicial review of an administrative decision

19   denying her claim for Disability Insurance Benefits and Supplemental Security benefits under the Social

20   Security Act, Titles II and XVI ("Act").  Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties

21   consented to proceed before a United States Magistrate Judge, and by a December 17, 2004 order, this

22   action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all further proceedings.

23   Pending before the Court is claimant's appeal from the administrative decision of the Commissioner of

24   Social Security ("Commissioner").

25         Claimant filed her complaint on August 19, 2004 and her opening brief on May 11, 2005.  The

26   Commissioner filed her opposition to the appeal on July 8, 2005.  Claimant filed a reply brief on July

27   14, 2005.

28   /////

                                              1

**BACKGROUND**

**Administrative Proceedings**

Claimant filed an application for disability insurance benefits on September 13, 2001 and on August 30, 2001 protectively filed an application for supplemental security income under the Social Security Act. (Administrative Record "AR" 70-72, 529-533.) She alleges a disability onset of June 15, 2001 due to high blood pressure, a thyroid problem, depression, headaches and a breathing problem. (AR 14, 82.)   The application was denied initially and upon reconsideration.  (AR 54-58, 61-64, 534, 535.) Claimant's application was further denied by an Administrative Law Judge ("ALJ") in a decision issued on April 7, 2004. (AR 11-19.)   At the hearing before the ALJ, claimant also alleged she had fibromyalgia, muscle aches, fatigue, anxiety attacks and dizziness from medication and fibromyalgia. (AR 558-560.)  She alleges she was exposed to mold at the Visalia County Courthouse.  The Appeals Council denied review.  (AR 5-7.)  Claimant filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

**Claimant's Background and Work Experience**

Claimant was born on November 5, 1955. (AR 550.)  She completed the tenth grade.  (AR 550.)

**Medical History**

The pertinent medical history is summarized as follows.

Claimant saw Jonathan Wasserberger, M.D., on April 13, 2001 complaining of mold exposure for 5 months.  (AR 146.) She reported feeling sick, headaches, fatigue, nausea, and bone aches.  (AR 146.) On examination she had normal Rhomberg, laboratory tests were within normal limits and mold serology in pulmonary hypersensitivity range, ANA and Rheumatoid test were negative. (AR 147.)  On June 15, 2001, claimant saw Dr. Wasserberger again.  A brain cyst was found and she was to see a neurosurgeon and given one month off of work.  (AR 145.)

Claimant was seen for depression by Jaime DelaCerna, M.D. in March 26, 2001, July 2001 and September 2001, while claimant coped with her mother's illness and passing. (AR 150-151.) She also saw Dr. DelaCerna for hypertension.  (AR 152-153.)

Claimant was first examined by Gary Ordog, M.D., in March 2001 for multiple symptoms. (AR 266.)  On physical examination, Dr. Ordog found positive 12 of 18 trigger points, elevated blood

pressure, positive 10 mercury amalgam, an positive ataxia and positive heal to toe.  (AR 168.)  Dr. Ordog diagnosed mold exposure, chemical fibromyalgia, toxic leukoencephalopathy, reactive airways dysfunction syndrome, mold infection on feet, skin, toenails and sinuses and chronic sinusitis.  (AR 268.)  He requested a Lupus panel, which was normal.  (AR 268, 249.)   He requested a pulmonary function test, which was normal.  (AR 268, 253-254.)  A March 14, 2001 MRI of the brain showed a cyst-like mass suggesting cerebrospinal fluid.   (AR 252.)   The impression was Differential considerations would include an arachnoid cyst or Rathke's cleft cyst; an epidermoid cyst may occasionally appear similarly; an aneurysm was considered unlikely.  (AR 252.)

A follow up examination by Dr. Ordog on May 16, 2001 showed a normal physical examination.  (AR 245.)  He diagnosed mold induced chronic fatigue, reactive airway disease and fibromyalgia. (AR 245.)  In August 2001, Dr. Ordog's examination was positive for headaches, 18 of 18 trigger points, tender back and neck, and increased thyroid size and tender on left side.  (AR 242.)

A repeat MRI of the brain was performed on June 11, 2001, which showed no significant change since the March 2001 examination.  (AR 240-241.)

Claimant was referred to Surisham Dhillon, M.D., for a neurological consultation.  (AR 167.)  Dr. Dhillon's impression was that claimant had common migraine headaches.  Her neurological exam was normal except for diffuse sensory deficit in right upper extremity only.  (AR 167.)

In a follow up with Dr. Ordog on September 18, 2001, he noted that fibromyalgia pain was helped with Vioxx, her blood pressure was better, and she had 18 of 18 trigger points.  (AR 236-237.)  In a follow up with Dr. Ordog on December 7, 2001, claimant had headaches and Dr. Ordog put claimant on life long total permanent disability.  (AR 235.)

On October 31, 2001, state agency physician, Murray Mitts, completed the Physical Residual Functional Capacity Assessment form.  (AR 187-194.)  He found claimant able to lift 20 pounds occasionally and 10 pounds frequently, stand/sit/walk six hours in an 8 hour workday and not otherwise limited.  (AR 187-194.)

A nerve conduction study by Richard Pantera, M.D., on February 19, 2002 revealed significant mild carpal tunnel syndrome on the left.  (AR 270-271.)  An MRI of the cervical spine on September 2, 2003, showed an impression of degenerative disc disease, anterior disc protrusions with osteophytes

1  from C4 to C7 levels, negative for posterior disc protrusions, spinal stenoses, or impingement of cervical

2  nerve roots.  (AR 384-385.)

3       On November 14, 2003, Gary Ordog, M.D., completed three questionnaires: (1) Fibromyalgia

4  Residual Functional Capacity Questionnaire (AR 413-317), (2) Residual Functional Capacity

5  Questionnaire (AR 418-422), and (3) Headaches Residual Functional Capacity Questionnaire (AR 423-

6  427).  In the Fibromyalgia Residual Functional Capacity Questionnaire, Dr. Ordog states that claimant

7  meets the criteria of the American Rheumatological criteria for fibromyalgia.  (AR 413.)  Dr. Ordog

8  noted multiple trigger points, non restorative sleep, chronic fatigue, morning stiffness, subjective

9  swelling, irritable bowel syndrome, depression, numbness and tingling, sicca symptoms, dysmenorrhea,

10  anxiety, panic attacks, frequent severe headaches, vestibular dysfunction, cognitive impairment, carpal

11  tunnel syndrome, chronic fatigue syndrome and myofascial pain syndrome.  (AR 413-415.)  Dr. Ordog

12  assessed claimant as able to sit/stand/walk less than 2 hours in and 8 hour day and can lift 10 pounds but

13  never 20 pounds, among other limitations.  (AR 415-416.)

14       On the Residual Functional Capacity Questionnaire, Dr. Ordog noted claimant experiences pain,

15  fatigue, and other symptoms severe enough to interfere with attention and concentration needed to

16  perform even simple work tasks.  (AR 418-422.)  She can maintain attention and concentration for 10

17  minutes and cannot perform even low stress jobs.  (AR 419.)  She can sit/stand only 30 minutes at a time

18  and sit/stand/walk 2 hours in and 8 hour workday.  (AR 420.)  She has significant limitation in doing

19  repetitive reaching, holding or fingering and can lift 10 pounds but never 20 pounds.  (AR 421.)

20       In the Headaches Residual Functional Capacity Questionnaire, Dr. Ordog stated that claimant

21  has headaches which occur 2 times a week, they are chronic and severe.  (AR 423.)  She has symptoms

22  of vertigo, nausea/vomiting, photosensitivity, visual disturbances, mood changes and mental confusion.

23  (AR 423.)  During the headaches, claimant would be precluded from performing even basic activities

24  and would be absent more than 4 days a month.  (AR 425-427.)

25       On July 8, 2003, claimant saw Dr. Ordog for a medical toxicology follow up visit.  (AR 439.)

26  She continued to complain of problems associated with exposure to mold in the courthouse.  (Ar 439.)

27  He assessed claimant with anemia, chronic fatigue insomnia deficiency syndrome, dyspnea, headaches,

28  high blood pressure, immune deficiency unspecified, joint pain, memory loss, mycotoxicosis, reactive

4

1  airways disease, status post motor vehicle accident injury, status post renal artery stenosis surgery and
2  toxic encephalopathy.  (AR 440.)

3  **Hearing Testimony**

4      Claimant described her work history.  She was a gate attendant for Tulare County Parks and
5  Recreation, an office assistant for the Tulare County Superior Court, office assistant for the Municipal
6  Court in Exeter, clerical worker at a citrus packing plant, quality control worker for another packer. (AR
7  551- 554.)  In her clerical job, she lifted 20 pounds, in her quality control job she lifted 50 pounds with
8  the help of a dolly.  (AR 554.)  She also was a citrus grader for 11 years.  (AR 554-555.)  She testified
9  that when she worked at the Visalia court house, she started getting headaches, dizziness and broke out
10 into a rash.  (AR 556.)  She later became part of a worker's compensation claim for mold toxic exposure.
11 (AR 556.)  She sees a specialist who prescribes medication for her symptoms of nausea, insomnia,
12 muscles and bone aches.  (AR 556.)  She gets headaches 2-3 times a week, her eyes burn and she gets
13 nauseated.  (AR 557.)  Her muscles in her legs and arms ache and she has to elevate her feet.  (AR 558.)
14 She has been told she has fibromyalgia.  (AR 558.)  She has body aches, cannot sleep, is nauseated, has
15 dizziness, and fatigue.  (AR 559.)  She also gets anxiety attacks and has depression.  (AR 559.)  She
16 takes Zoloft for her depression which helps a little bit and she takes Ultracet and Ibuprofen for her pain
17 which helps her.  (AR 560.)  The fibromyalgia and medication has side effects of making her dizzy,
18 nauseated and tired.  (AR 560.)  She cannot lift a gallon of milk because her muscles ache.  (AR 561.)
19 She can walk 5 minutes, sit for a half an hour to 45 minutes, and stand for about an hour.  (AR 561.)
20 She said she cannot work because she is forgetful, has headaches, and light affects her eyes.  (AR 563.)

21 **ALJ Findings**

22     In his April 7, 2004 decision , the ALJ characterized the "primary issue" before him as whether
23 claimant was disabled. (AR 14.)  In determining claimant was not disabled and not eligible for disability
24 benefits, the ALJ made the following findings (AR 17-18):

25     1.    The claimant met the disability insured status requirements of the Act on June 15, 2001,
26             the date the claimant stated she became unable to work, and continued to meet them
27             through December 31, 2001.

28     2.    The claimant has not engaged in substantial gainful activity since June 15, 2001.

3.   The medical evidence establishes that the claimant has a history of brief exposure to mold with complaints of episodic headaches, fatigue, dizziness, general body aches, and forgetfulness, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.   Claimant's allegations of pain and limitations are not found to be credible as noted in the body of the decision.

5.   The claimant has the residual functional capacity to perform work-related activities except for work involving lifting and carrying more than 10 pounds frequently or 20 pounds occasionally, and from exposure to excessive pulmonary irritants.

6.   The claimant's past relevant work as a clerical worker did not require the performance of work-related activities precluded by the above limitations.

7.   The claimant's impairments do not prevent the claimant from performing her past relevant work.

8.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision.

**DISCUSSION**

**Standard of Review**

Congress has provided a limited scope of judicial review of a Commissioner's decision. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings). Substantial evidence is "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Jones,* 760 F.2d at 995. If there is substantial evidence to support

6

1  the administrative findings, or if there is conflicting evidence that will support a finding of either

2  disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d

3  1226, 1229-1230 (9th Cir. 1987).

4      Thus, this Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g) to

5  determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence

6  in the record as a whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).

7      Claimant contends the ALJ erred by: (1) rejected the treating physician, Dr. Ordog (2) failed to

8  assess her chronic fatigue, and (4) failed to assess her fibromyalgia.

9                    **The ALJ's Finding of Residual Functional Capacity**

10     To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial

11  gainful activity due to a medically determinable physical or mental impairment which has lasted or can

12  be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(a)(3)(A).

13     The Commissioner has final responsibility to determine a claimant's residual functional capacity.

14  20 C.F.R. § 404.1546. "Residual functional capacity" is the phrase used by the Commissioner to denote

15  a claimant's ability to perform work-related tasks despite his physical or mental impairments. 20 C.F.R.

16  §§ 404.1545(a) and 416.945(a). Categories of residual functional capacity include sedentary, light,

17  medium, heavy and very heavy work. 20 C.F.R. §§ 404.1567 and 416.967. In this case, the ALJ found

18  that plaintiff had the residual functional capacity to perform light work, with restrictions. Under the

19  applicable regulations, "light work" is defined as follows:

20          Light work involves lifting no more than 20 pounds at a time with frequent lifting
            or carrying of objects weighing up to 10 pounds. Even though the weight lifted
21          may be very little, a job is in this category when it requires a good deal of
            walking or standing, or when it involves sitting most of the time with some
22          pushing and pulling of arm or leg controls. To be considered capable of
            performing a full or wide range of light work, you must have the ability to do
23          substantially all of these activities.

24  20 C.F.R. §§ 404.1567(b) and 416.967(b). Social Security Ruling 83-10 further defines this term by

25  stating that " . . . the full range of light work requires standing or walking, off and on, for a total of

26  approximately 6 hours of an 8-hour workday." Ruling 83-10 further explains that "[s]itting may occur

27  intermittently during the remaining time."

28     Here, the ALJ found that claimant has the residual functional capacity to perform work-related

7

1    activities except for work involving lifting and carrying more than 10 pounds frequently or 20 pounds

2    occasionally, and from exposure to excessive pulmonary irritants.

3        Claimant argues that the ALJ should have adopted Dr. Ordog's limitations on sitting, standing

4    walking, lifting, and work absence for 4 days per month. (Opening Brief p.10.)

5        Generally, more weight should be given to the opinion of a treating source than to the opinion

6    of doctors who do not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The Ninth

7    Circuit has held that a treating physician's opinion is generally to be afforded great weight in disability

8    cases because he or she ". . . is employed to cure and has a greater opportunity to know and observe the

9    patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987); *see also* 20 C.F.R.

10   §§ 404.1527(d) and 416.927(d). However, a treating physician's opinion is not conclusive as to a

11   claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even

12   where it is not contradicted. 20 C.F.R. § 404.1527(e); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n.

13   7 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (inconsistencies and

14   ambiguities in treating physician's opinion concerning level of disability sustained by social security

15   claimant, were specific and legitimate reasons for not accepting physician's opinion.)

16       The Ninth Circuit Court of Appeals has established requirements when an ALJ disregards the

17   treating physician's opinion:

18           "The ALJ may disregard the treating physician's opinion, but only by
             setting forth "specific, legitimate reasons for doing so, and this decision
19           must itself be based on substantial evidence." This burden can be met by
             providing a detailed summary of the facts and conflicting clinical
20           evidence, along with a reasoned interpretation thereof. *Id.* Furthermore,
             the ALJ's reasons for rejecting the doctor's opinion must be "clear and
21           convincing."

22   *Rodriquez,* 876 F.2d at 762 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

23        A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary

24   will concur, absent review of medical findings and other evidence. 20 C.F.R. §416.928. Claimant bears

25   the burden of proving that he is disabled by presentation of "complete and detailed objective medical

26   reports of h[is] condition from [a] licensed medical professional." *Meanel v. Apfel*, 172 F.3d 1111, 1113

27   (9th Cir. 1999) (citing 20 C.F.R. 404.1512(a)-(b), 404.1513(d)).

28       The ALJ gave a detailed summary of the facts and conflicting clinical evidence. (AR 15-17.)

8

1   The ALJ reviewed all of the objective medical evidence in the record, including the records of doctors

2   Rosemary Leon, Jonathan Wasserberger, Jaime Delacerna, Surisham Dhillon, Gary Ordog, Richard

3   Pantera, Adolph Nava, and Shashi Sharma.  He reviewed medical records from Valley Industrial Medical

4   Group, Orthopaedic Associates, Kaweah Delta Health Care District and from Family Health Care.  He

5   identified the conflicting clinical evidence.  There is no argument that the ALJ failed to properly do so.

6          Claimant argues that Dr. Ordog completed three questionnaires, each of which preclude claimant

7   from performing even sedentary work.  She argues that Dr. Ordog is a toxicologist specialist and his

8   opinion should have been adopted.  (Opening brief p.10-11.)

9          The ALJ reviewed all the medical records from Dr. Ordog, and noted the lack of functional

10   restrictions placed on claimant while in treatment:

11          The undersigned finds it significant that no functional restrictions were
            noted to be imposed upon the claimant in any of the treatment notes by
12          Dr. Ordog other than to avoid a mold infested environment."  (AR 17)
            (Evidence citation omitted.)
13

14   The ALJ then contrasted this lack of restriction with Dr. Ordog's ultimate restrictions:

15          "However, he completed functional questionnaires indicating claimant
            was severely limited in her ability to sit, stand, lift, carry, reach, handle
16          or finger items."  (AR 17) (Evidence citations omitted.)

17   The ALJ then noted the overexpansive scope of Dr. Ordog's restrictions:

18          "Dr. Ordog is a toxicologist, but he commented on claimant's health from
            a psychiatric or psychological standpoint.  If claimant does suffer from
19          severe fibromyalgia, the evidence fails to show that claimant's treating
            physician referred claimant to a rheumatologist or other specialist
20          familiar before diagnosing fibromyalgia, nor is there any evidence
            whether claimant's treating source systematically attempted to eliminated
21          other cause for her alleged pain."  (AR 17.)

22   As correctly noted by the ALJ, Dr. Ordog is a toxicologist and not a rheumatologist.[1]  See 20 C.F.R.

23   §§404.1527(d)(5) and 416.927(d)(2)(ii)(5) ("We generally give more weight to the opinion of a specialist

24

25          [1] "Toxicology" is the sum of what is known regarding poisons; the scientific study of poisons, their actions, their
       detection, and the treatment of the conditions produced by them.  *Dorland's Illustrated Medical Dictionary* p.1926 (30th ed.
26     2003).  "Rheumatism" is the popular name for any of a variety of disorders marked by inflammation, degeneration, or
       metabolic derangement of connective tissue structures of the body, especially the joints and related structures, including
27     muscles, bursae, tendons, and fibrous tissue, with pain, stiffness or limitation of motion.  *Id.* at p. 1627. Rheumatology is the
       relevant specialty for fibromyalgia.  *Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004).
28

1  about medical issues related to his or her area of specialty than to the opinion of a source who is not a

2  specialist."). Specialized knowledge may be particularly important with respect to a disease such as

3  fibromyalgia that is poorly understood within much of the medical community. *Benecke v. Barnhart*,

4  379 F.3d 587, 594 n.4 (9th Cir. 2004). Since Dr. Ordog's specialization in not in the applicable area, his

5  opinion is not entitled to controlling weight.

6       Moreover, the ALJ cited to the record to show lack of findings to support Dr. Ordog's

7  restrictions:

8          "Although claimant complains of aches and pains, the undersigned noted
           that test results (laboratory and x-ray) presented show nothing more than
9          "normal" or "mild' findings which seems quite disproportionate to the
           severity of the pain she alleges."
10

11  The ALJ noted the lack of muscle atrophy, which would corroborate her claim of debilitating pain:

12         "Additionally, a common side effect of chronic pain is diffuse atrophy or
           muscle wasting. Dr. Ordog's clinic notes do not show that claimant's
13         degree of pain has altered the use of her muscles and joints to the extent
           that it has resulted in diffuse atrophy of muscle wasting. Testimony
14         revealed that claimant engages in a somewhat normal level of daily
           activity, which is not consistent with a severe pain syndrome or severe
15         chronic fatigue syndrome." (AR 17-18.)

16  The ALJ rejected Dr. Ordog's finding that claimant is "life long totally permanently disabled" as an

17  opinion reserved to the Commissioner and because the criteria by which Dr. Ordog assessed permanent

18  disability was not set forth. (AR 18.) "[T]he opinion of the treating physician is not necessarily

19  conclusive as to either the physical condition or the ultimate issue of disability.' *Morgan v. Comm'r of*

20  *the Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir.1999). The ALJ set forth specific and legitimate

21  reasons to reject Dr. Ordog's assessment in full and provided a comprehensive, detailed summary of the

22  facts and conflicting clinical evidence.

23       Claimant argues that the ALJ failed to mention or assess the functional limitations imposed by

24  Dr. Ordog on March 21, 2002. (AR 229-230.) Claimant acknowledges that the ALJ considered the

25  three questionnaires signed by Dr. Ordog. (Opening Brief p.12.) Claimant argues that the ALJ erred

26  in failing to give reasons why he rejected the March 21, 2002 report.

27       Dr. Ordog's March 21, 2002 report contains limitations that claimant can occasionally lift and

28  carry 10 pounds and less than 10 pounds frequently; stand/walk/stand less than 2 hours in an eight hour

day, and other limitations.  (AR 229.)  These limitations are the same as those imposed by Dr. Ordog

in his later three questionnaires considered and rejected by the ALJ.  The Ninth Circuit has long held that

ALJ does not need to discuss all evidence presented to him. *Vincent v. Heckler,* 739 F.2d 1393, 1394-95

(9th Cir.1984) (Commissioner "must explain why significant probative evidence has been rejected.").

## Consideration of SSR 99-2p - Chronic Fatigue and Fibromyalgia

Claimant argues that the ALJ erred in failing to find the chronic fatigue and fibromyalgia

disabling and erred in failing to follow Social Security Ruling ("SSR") 99-2p on Chronic Fatigue

Syndrome.

The Commissioner has noted that chronic fatigue syndrome and fibromyalgia are medically

determinable and that the existence of certain symptoms, including the presence of focal trigger points,

may be sufficient to establish the diagnosis. *See* SSR 99-2p ("Evaluating Cases Involving Chronic Pain

Syndrome (CFS")).  Indeed, SSR 99-2p notes that: "There is considerable overlap of symptoms between

CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a

medically determinable impairment. Individuals with impairments that fulfill the American College of

Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill

the criteria for CFS."  SSR 99-2p n. 3.

SSR 99-2p, however, does not address fibromyalgia other than to note a similarity with CFS.

SSR 99-2p also does not address the legal analysis for fibromyalgia.  *See Gavigan v. Barnhart,* 261

F.Supp.2d 334, 340 n.9 (D.Md. 2003) (Although SSR 99-2p mentions fibromyalgia in the sense that it

acknowledges some overlapping symptoms, the two diseases are not the same; SSR 99-2p, therefore,

is not binding as to the evaluation of fibromyalgia.)

The Ruling, nonetheless, explains that claims based on CFS should be evaluated using the same

five-step process that the ALJ used in evaluating claimant's complaints:

> Step 3. When an individual is found to have a severe impairment, the
> adjudicator must proceed with the sequential evaluation process and must
> next consider whether the individual's impairment is of the severity
> contemplated by the Listing of Impairments contained in appendix 1,
> subpart P of 20 CFR part 404. Inasmuch as CFS is not a listed
> impairment, an individual with CFS alone cannot be found to have an
> impairment that meets the requirements of a listed impairment; however,
> the specific findings in each case should be compared to any pertinent
> listing to determine whether medical equivalence may exist.

1   If the impairment does not meet the Listings, SSR 99-2p requires the ALJ to continue with the sequential

2   evaluation:

3               Steps 4 and 5. For those impairments that do not meet or equal the
                severity of a listing, an assessment of residual functional capacity (RFC)
4               must be made, and adjudication must proceed to the fourth and, if
                necessary, the fifth step of the sequential evaluation process.

5

6        The ALJ found that the medical evidence establishes that the claimant has a history of brief

7   exposure to mold with complaints of episodic headaches, fatigue, dizziness, general body aches, and

8   forgetfulness, but that she does not have an impairment or combination of impairments in the Listing.

9   (AR 19, Finding no. 3.)

10       The ALJ properly analyzed claimant's chronic fatigue syndrome and fibromyalgia, carefully

11   considered all the medical evidence in the record, claimant's subjective complaints, her daily activities

12   and her treatment modalities.  (AR 16, 17.)  The ALJ reviewed claimant's subjective complaint of

13   fatigue, dizziness, anxiety, and headaches:

14               "According to claimant, she began having headaches, dizziness and a rash
                after working one to two months at the Visalia Court House.  Eventually
15               black mold was discovered in the courthouse.  Claimant said she
                continues to have headaches, nausea, an inability to sleep and her bones
16               ache.  She said she has headaches two to three times a week accompanied
                by burning  of the eyes and nausea. . . ."  (AR 16.)

17

18   The ALJ considered claimant's activities of daily living: "After rising in the morning, claimant said she

19   has breakfast, washes dishes, walks on the treadmill, takes a nap, picks up around the house and cooks.

20   " (AR 17.)  He also evaluated her medication in light of the list of illnesses:

21               "According to the list of medications, claimant takes Ibuprofen for her
                headaches and pain, a medication that can be purchased over-the-counter,
22               and normally used as an anti-inflammatory medicine.  It is not generally
                prescribed for severe migraine headaches, which suggests that perhaps
23               claimant's headaches are not as severe as alleged. . . .Claimant presents
                a host of ailments in the medical evidence of record that appear to have
24               been treated symptomatically, as noted above.  A review of the list of
                medications indicates that claimant has been taking the same medication
25               regime for quite some time, which suggest[s] that she must be receiving
                positive results.  Otherwise, it would seem reasonable to assume that a
26               change in therapy would be appropriate."  (AR 17) (Evidence citations
                omitted.)

27

28   From this evidence, the ALJ concluded that claimant's ailments were controlled.  This is a logical

12

1  inference. The ALJ is entitled to draw inferences logically flowing from the evidence in the proceedings

2  before him. *See Macri v. Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996).

3       The ALJ also found that claimant's "laboratory findings (mold serology) were noted to be in the

4  hypersensitivity range. However, the pulmonary function test was with normal limits. Liver function

5  test was within normal limits. ANA and rheumatoid testing was negative." (AR 17) (Evidence citations

6  omitted.)

7       After considering all of this evidence, the ALJ concluded that claimant could perform light work

8  with avoidance of concentrated exposure to pulmonary irritants. The ALJ relied upon the state agency

9  consultative reviewer's opinion that claimant is limited to light work with avoidance of fumes, odors,

10  dusts, gases, poor ventilation and mold. (AR 18, 218-225.) The opinion of a reviewing physician and

11  the ALJ's conducting an independent analysis of the medical evidence may constitute substantial

12  evidence. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). There is substantial evidence in the

13  record to support the ALJ's findings. The Court does not find error in the ALJ's assessment of residual

14  functional capacity.

15                  **<u>Claimant's Credibility</u>**

16       Claimant argues that the ALJ failed to adequately consider that the claimant's persistent

17  efforts to obtain medical help enhances her credibility. Claimant cites Social Security Ruling 96-7p.

18       Social Security Ruling 96-7p provides in pertinent part that persistent attempts by the individual

19  to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of

20  treatment modalities in an attempt to find one that works or that does not have side effects, referrals to

21  specialists, or changing treatment sources may be a strong indication that the symptoms are a source of

22  distress to the individual and generally lend support to an individual's allegations of intense and

23  persistent symptoms. *Hardman v. Barnhart*, 362 F.3d 676 (10th Cir. 2004) (error for the ALJ to fail to

24  expressly consider claimant's persistent attempts to find relief from his pain, his willingness to try

25  various treatments for his pain, and his frequent contact with physicians concerning his pain-related

26  complaints.)

27       Here, the ALJ fully considered claimant's complete medical treatment record. He considered

28  her physical impairment treatment. ( AR 17-18.) The ALJ even considered the type of treatment that

1   claimant was not receiving.  (AR 17; "claimant complains of aches and pains; e.g., fibromyalgia, but yet

2   it is relevant that claimant has not received treatment consistent with a chronic pain syndrome which as

3   biofeedback, acupuncture, use of a TENS unit, injections, or attendance at a pain management clinic.")

4   The ALJ also noted the stability of claimant's medication regime, which indicates claimant is receiving

5   positive results.  Thus, the ALJ adequately considered the claimant's treatment efforts.

6                                                  **CONCLUSION**

7          The Court finds no error in the ALJ's analysis.  As such, the ALJ's decision is supported by

8   substantial evidence in the Record as a whole and based on proper legal standards.  Accordingly, this

9   Court DENIES claimant's appeal from the administrative decision of the Commissioner of Social

10  Security.  The clerk of this Court is DIRECTED to enter judgment as a matter law in favor of defendant

11  Jo Anne B. Barnhart, Commissioner of Social Security and against claimant Rosemary D. Martinez.

12

13  IT IS SO ORDERED.

14  **Dated:    August 21, 2005**                    **/s/ Lawrence J. O'Neill**
    b9ed48                              UNITED STATES MAGISTRATE JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                  14